UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| | : | I N D I C T M E N T |
| | : | 18 U.S.C. § 2 |
| v. | : | 18 U.S.C. § 1956(a)(1)(A)(i) |
| | : | 18 U.S.C. § 1956(h) |
| | : | 18 U.S.C. § 1957 |
| | : | 21 U.S.C. § 841(a)(1) |
| | : | 21 U.S.C. § 841(b)(1)(C) |
| | : | 21 U.S.C. § 841(b)(1)(E) |
| JOHN RANDY CALLIHAN | : | 21 U.S.C. § 846 |
| CHRISTOPHER STEGAWSKI | : | 21 U.S.C. § 856(a)(1) |
| | : | Notice of Forfeiture |

- - - - - - - - - - - - - - -

THE GRAND JURY CHARGES THAT:

1.  Beginning in or about November of 2009, and continuing up to and including the date of this Indictment, defendants **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** owned and/or operated a business initially known as "Eastside Medical Specialist."  The business operated in Dayton, Ohio in the Southern District of Ohio beginning in or about November of 2009.  In or about February of 2010, the business moved to Lucasville, Ohio and the name changed to "Lucasville Medical Specialist."  In October of 2010, **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** split as business partners and "Lucasville Medical Specialist" was changed to "Tri-State Medical."

2.  Beginning in or about November of 2009, and continuing up to and including November 18, 2010, defendant **JOHN RANDY CALLIHAN**

served as the primary owner and controlled the day-to-day operations of the clinics.

3. Beginning in or about December of 2009, and continuing up to and including November 18, 2010, defendant **CHRISTOPHER STEGAWSKI** represented himself as a chronic pain management doctor at "Eastside Medical Specialist," "Lucasville Medical Specialist," and an unnamed clinic located in Southpoint, Ohio.

4. Throughout the time frame listed above, the clinics owned and/or operated by **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** purported to operate "pain management" clinics to assist patients with chronic pain. However, through **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI**, the clinics in fact operated as "pill mills" by selling prescriptions for controlled substances (primarily oxycodone) without a legitimate medical need for the prescriptions as there was no legitimate doctor-patient relationship. Many of the prescriptions were openly sold and diverted.

### The Ownership and Control of the Clinics

5. Defendant **JOHN RANDY CALLIHAN** has no known medical education or background, but at all times relevant to this Indictment, he has been involved in the operation of at least two pain management clinics at various locations in Dayton and Lucasville, Ohio.

6. Defendant **CHRISTOPHER STEGAWSKI,** who does have a medical degree from Warsaw Medical School in Warsaw, Poland, was considered

2

a part owner of "Lucasville Medical Specialist." He received his medical degree in 1977 and his medical license from the State of Ohio that same year. He is purportedly trained to specialize in anesthesiology.

7.   During the course and in furtherance of the conspiracy, **JOHN RANDY CALLIHAN** did procure the services of **CHRISTOPHER STEGAWSKI** to serve as the physician who would see customers and prescribe medication at the clinics.

8.   Defendant **CHRISTOPHER STEGAWSKI** had a DEA registration number that allowed him to order controlled substances for the clinics.

### General Allegations and Terminology

9.   The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA and the Code of Federal Regulations ("CFR") contain definitions relevant to this Indictment, described below.

10.  The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, and V, as designated by Title 21 of the United States Code, Section 802(c)(6), and the CFR.

11.  The term "Schedule II" means the drug or other substance has a high potential for abuse; the drug has currently accepted medical use with severe restrictions; and abuse of the drug or

3

other substances may lead to severe psychological or physical dependence.

12. The term "Schedule III" means the drug or other substance has a high potential for abuse less than the drugs listed in Schedule II; the drug has currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

13. The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule III; the drug or other substance has a currently accepted medical use in treatment; and abuse of the drug or other substances may lead to a limited physical dependence or psychological dependence relative to the drugs or substances in Schedule III.

14. The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

15. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance.

16. The term "practitioner" means a medical doctor, physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he or

she practices, to dispense a controlled substance in the course of professional practice.

17. The Drug Enforcement Administration ("DEA") issues registration numbers to qualifying doctors, who become authorized to dispense Schedule II, III, IV, and V controlled substances. To issue a prescription for a controlled substance, a doctor must have a DEA registration number for each location in which they are dispensing medicine.

18. A prescription for a controlled substance violates the Controlled Substances Act and CFR if it is issued beyond the bounds of medical practice or is not for a legitimate medical purpose in the usual course of a professional practice.

19. The term "dosage" is the amount, frequency, and number of doses of medication authorized by a practitioner, who has been issued a DEA registration number.

20. The purpose of a urine test is to determine if the prescribed medications and/or illicit drugs (e.g., cocaine and marijuana) are present in the urine. The purpose of a serum test is to determine the level of prescribed medication and/or illicit drugs (e.g., cocaine and marijuana) in a person's blood.

21. The term "serious bodily injury" means bodily injury which involves a substantial risk of death, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

5

22. The term "locum tenens" refers to companies that provide placement services for temporary physician assignments or to the temporary physicians themselves.

### Charged Controlled Substances

23. OxyContin, which is also known as "Oxy," is a Schedule II controlled substance whose active ingredient is oxycodone. Demand for OxyContin has grown to epidemic proportions in parts of Ohio, Kentucky, and other parts of the United States where drug dealers can sell an 80 mg OxyContin pill on the street for $80.00 to $100.00 or more.

24. OxyContin, which is a brand name pill designed, manufactured, and promoted by Purdue Pharma to be a safer and less abusable drug for the treatment of chronic pain, is an analgesic-narcotic that contains oxycodone. Introduced to the market in or about 1995, OxyContin is a pill that gradually releases steady amounts of narcotics for 12 hours. OxyContin pills have contained dosages of 20, 40, 80, and 160 mg.

25. OxyContin and other Schedule II drugs have a high potential for abuse and can be crushed and snorted or dissolved and injected to get an immediate high. This abuse can lead to addiction and overdose, and sometimes death. The injection method of abuse of OxyContin (and other drugs) oftentimes leaves highly visible scars and ulcers on a patient's arms.

6

26. Roxicodon, also known as "Roxy," is a brand name pill that contains oxycodone.

27. Percocet, also known as "Perc," is a brand name pill that contains oxycodone.

28. Lorocet is a Schedule III controlled substance that contains hydrocodone.

29. Vicadin is a Schedule III controlled substance that contains hydrocodone.

30. Lortab, also known as "Tab," is a brand name pill that contains hydrocodone, a Schedule III controlled substance.

31. Valium is a brand name pill that contains diazepam, a Schedule IV controlled substance.

32. Alprazolam is a benzodiazepine, a Schedule IV controlled substance. Xanax is the brand name for alprazolam.

33. Carisprodal is a controlled substance in the State of Kentucky. Soma is the brand name for carisprodal.

## COUNT 1
### (Conspiracy to Distribute Narcotics)

34. Paragraphs 1 through 33 of the Indictment are re-alleged and incorporated into Count 1 of this Indictment.

35. From in or about November of 2009, and continuing up to and including November 18, 2010, in the Southern District of Ohio and elsewhere, the defendants, **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI**, and others both known and unknown to the Grand Jury, did

7

knowingly and intentionally combine, conspire, confederate, and agree with each other, to knowingly, intentionally, and unlawfully distribute and dispense, or possess with intent to distribute and dispense (whether through prescriptions or otherwise) mixtures and substances containing a detectable amount of diazepam, hydrocodone, oxycodone, alprazolam, and carisprodal not for a legitimate medical purpose and outside the scope of medical practice, in violation of Title 21, United States Code, Section 841(a)(1).

## Nature and Scope of Conspiracy

The purposes of the conspiracy included, but were not limited to, the following:

36. To make as much money as possible by prescribing, distributing, and dispensing controlled substances such as diazepam, hydrocodone, oxycodone, alprazolam, and carisprodal to patients, other drug users, and conspirators.

37. To satisfy the demand for the illegal distribution, sale, and consumption of controlled substances, including, but not limited to, diazepam, hydrocodone, oxycodone, alprazolam, and carisprodal in the areas of southern Ohio, northeastern Kentucky, and elsewhere, including, but not limited to, West Virginia, Ohio, and Kentucky.

## Ways, Manners, and Means of the Conspiracy

38. The clinics were usually open for five days per week. **CHRISTOPHER STEGAWSKI** would typically work for five day periods.

8

39.  During the course and scope of the conspiracy, JOHN RANDY CALLIHAN would push doctors to see at least 30 to 40 customers that were to pay for an office visit at the clinic per day.

40.  During the course and furtherance of the conspiracy, as many as 30 to 40 customers would attend the clinics in a single day.

41.  During the course and furtherance of the conspiracy, these customers would travel long distances to obtain a prescription at the clinics.  In some cases, customers traveled in excess of 200 miles round trip or in excess of 4 hours of travel time round trip to obtain prescriptions from the doctors.

42.  Customers were normally charged $200.00 cash for each visit and $125.00 cash for an urinalysis.  The clinics would normally not accept any other form of payment.

43.  During the course and in furtherance of the conspiracy, each of these customers would receive at most a cursory examination at the clinic by the physician. The customers would then sit briefly in the waiting area before being called back to an "exam" room to be seen by CHRISTOPHER STEGAWSKI and receive a prescription for a controlled substance.

44.  During and in furtherance of the conspiracy, customers of the clinic that the clinic and the defendants knew or should have known to be drug abusers received large amounts of prescription medication.

9

45. During the course and in furtherance of the conspiracy, as part of the treatment, these customers would receive the same regiment of prescribed medications, namely oxycodone, hydrocodone, and either diazepam or alprazolam. Certain other customers received prescriptions for oxycontin.

46. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI** continued the clinic's practice of prescribing the same regiment of drugs to customers.

47. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI** continued the practice of not conducting any meaningful examination of these customers to determine if there existed legitimate medical need or purpose for the prescription of controlled substances.

48. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI** knowingly caused or had a reasonable expectation of addiction by these customers thereby requiring the customers to return more frequently to the clinic and **CHRISTOPHER STEGAWSKI** to prescribe excessive amounts of theses controlled substances. Thereby, **CHRISTOPHER STEGAWSKI** insured the customers' payments to the clinic for office visit fees.

49. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI** rarely, if ever, counseled these customers regarding alternative treatments, such as physical therapy,

10

psychological or addiction counseling, surgery, or any other treatment for pain, instead of high levels of narcotics.

50. During the course and in furtherance of the conspiracy, many local pharmacies refused to honor any prescriptions written by **CHRISTOPHER STEGAWSKI** due to the "large quantities of narcotics" and his "catering to customers with prior drug abuse and arrest histories."

51. During the course and in furtherance of the conspiracy, many customers stated they were going to pain clinics that were owned by **JOHN RANDY CALLIHAN** because they knew they would be able to get prescription pain pills without any medical evaluation. A majority of patients interviewed admitted they were addicted to pain pills prior to going to **JOHN RANDY CALLIHAN's** pain clinics, they had no legitimate pain to be prescribed the narcotics, or they were only going to the pain clinics to easily obtain prescriptions because they were drug dealers themselves, selling the prescription pills on the "street."

52. During the course and in furtherance of the conspiracy, other witnesses stated they were "sponsoring" other individuals to go to Lucasville Medical Specialist on their behalf in order to obtain prescriptions for oxycodone. These individuals would pay for the office visit and pay to have the prescription filled. The witnesses stated they were being "sponsored" or they were "sponsoring" other individuals.

11

53. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI**, between May 2010 and August 2010 ordered large dosage units of controlled substances for the clinic.

54. **CHRISTOPHER STEGAWSKI** was actively involved in the ordering of the controlled substances.

55. These controlled substances were ordered with the purpose of distributing the pills within the clinics "in-house" dispensary to generate additional income.

56. During the course and in furtherance of the conspiracy, **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** distributed and dispensed, and did aid and abet the distribution and dispensing of controlled substances, including, but not limited to, oxycontin, diazepam, hydrocodone, oxycodone, and alprazolam, to customers despite obvious indications that such customers were abusing, misusing, and distributing the controlled substances prescribed.

57. During the course and in furtherance of the conspiracy, **CHRISTOPHER STEGAWSKI** prescribed excessive amounts of controlled substances, including, but not limited to oxycontin, diazepam, hydrocodone, oxycodone, and alprazolam, with the knowledge and understanding or having a reasonable cause to believe that these controlled substances were being further distributed by his conspirator customers due to the high cost in cash required for the office visit and obtaining the controlled substance.

12

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C) & (E), and 846.

## COUNT 2
### (Maintaining a Place For The Purpose of Distribution)

58. Beginning in or about November of 2009, and continuing up to and including February of 2010, defendants **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** knowingly and intentionally maintained a place at 4322 Airway Road, Dayton, Ohio, for the purpose of distributing Schedule II, III, and IV controlled substances.

In violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

## COUNT 3
### (Maintaining a Place For The Purpose of Distribution)

59. Beginning in or about February 2010, and continuing up to and including October of 2010, defendants **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** knowingly and intentionally maintained a place at 10940 State Route 104, Lucasville, Ohio, for the purpose of distributing Schedule II, III, and IV controlled substances.

In violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

13

## COUNT 4
### (Maintaining a Place For The Purpose of Distribution)

60.   Beginning in or about October of 2010, and continuing up to and including November 18, 2010, defendant **CHRISTOPHER STEGAWSKI** knowingly and intentionally maintained a place at 211 Township Road, Suites 2 & 3, South Point, Ohio, for the purpose of distributing Schedule II, III, and IV controlled substances.

In violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

## COUNT 5
### (Conspiracy to Launder Monetary Instruments)

61.   From in or about December of 2009 through November 18, 2010, in the Southern District of Ohio, defendants **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and 1957, to wit:

(a)   to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is issued three (3) checks from U.S. Bank account # XXXXXXXX6229, captioned in the name of Eastside Medical Specialist, 4322 Airway Road, Dayton, Ohio, in the amounts of $10,000.00, $10,000.00, and

14

$16,000.00, on December 29, 2009, January 23, 2010, and February 9, 2010, with the intent to promote the carrying on of specified unlawful activity, that is the illegal distribution of narcotics, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

(b) to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is a deposit of $14,220.00, on May 3, 2010 into account # XXXXXXXX8841, captioned in the name of Lucasville Medical Specialist, such property having been derived from a specified unlawful activity, that is, the illegal distribution of narcotics, in violation of Title 18, United States Code, Section 1957.

<u>**MANNER AND MEANS**</u>

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

62. During the course of the conspiracy, **JOHN RANDY CALLIHAN** and **CHRISTOPHER STEGAWSKI** were partners in the ownership of the pain clinic, "Lucasville Medical Specialist."

15

63. During the course of the conspiracy, **CHRISTOPHER STEGAWSKI** opened a bank account at U.S. Bank, in Lucasville, Ohio, in the name of "Lucasville Medical Specialist," which was identified as a business checking account.

64. During the course of the conspiracy, **JOHN RANDY CALLIHAN** made numerous deposits in U.S. currency to said bank account.

65. During the course of the conspiracy, **CHRISTOPHER STEGAWSKI** used the bank account to purchase Schedule II, III, and IV controlled substances to dispense from "Lucasville Medical Specialist."

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 6- 9

66. On or about the dates set forth below, in the Southern District of Ohio, and elsewhere, defendant **JOHN RANDY CALLIHAN** did knowingly engage and attempt to engage in the following monetary transactions by, through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000.00, that is the deposit of U.S. currency, such property having been derived from a specified unlawful activity, that is, the illegal distribution of narcotics.

67. Counts 6 - 9 deposits are from proceeds of a specified unlawful activity that were deposited into account # XXXXXXXX6229 captioned in the name of Eastside Medical Specialist, 4322 Airway

16

Road, Dayton, Ohio, identified as a business checking account. This account was opened by **JOHN RANDY CALLIHAN** in December 2009 with an initial deposit of $30,000.00 in U.S. currency.

68. **JOHN RANDY CALLIHAN** made deposits in U.S. currency to the listed bank account which caused a currency transaction report to be filed.

69. As detailed below, bank records for account # XXXXXXXX6229, captioned in the name of Eastside Medical Specialist reflect cash deposits totaling $79,500.00 over a period of three (3) months:

| COUNT | TYPE | DATE | | AMOUNT |
|-------|------|------|---|--------|
| 6 | U.S. currency | 12/07/2009 | $ | 30,000.00 |
| 7 | U.S. currency | 12/14/2009 | $ | 17,000.00 |
| 8 | U.S. currency | 01/27/2010 | $ | 16,500.00 |
| 9 | U.S. currency | 02/10/2010 | $ | 16,000.00 |
| | | TOTAL | $ | 79,500.00 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

### COUNT 10

70. On or about May 3, 2010, in the Southern District of Ohio, defendant **CHRISTOPHER STEGAWSKI** did knowingly engage and attempt to engage in a monetary transaction by, through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000.00, that is the deposit of $14,220.00 U.S. currency into bank account # XXXXXXXX8841, captioned in the name of Lucasville Medical

17

Specialist, 10940 State Route 104, Lucasville, Ohio, such property having been derived from a specified unlawful activity, that is, the illegal distribution of narcotics.

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT 11

71. On or about December 29, 2009, in the Southern District of Ohio, defendant **JOHN RANDY CALLIHAN** did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit: **JOHN RANDY CALLIHAN** subsequently issued three (3) checks from U.S. Bank account # XXXXXXXX6229, captioned in the name of Eastside Medical Specialist, 4322 Airway Road, Dayton, Ohio, identified as a business checking account, to LocumTenens.com. LocumTenens.com is a recruiting company for doctors, which involved the proceeds of a specified unlawful activity, that is the illegal distribution of narcotics, with the intent to promote the carrying on of specified unlawful activity, to wit: to hire a number of doctors, and that while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

72. As detailed below, bank records for account # XXXXXXXX6229 captioned in the name of Eastside Medical Specialist reflect checks totaling $36,000.00 on various dates being written.

18

| CHECK # | DATE | AMOUNT |
|---------|------|--------|
| 1005 | 12/29/2009 | $ 10,000.00 |
| 1013 | 01/23/2010 | $ 10,000.00 |
| 1025 | 02/09/2010 | $ 16,000.00 |
| | TOTAL | $ 36,000.00 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## FORFEITURE ALLEGATION 1

### (COUNTS 1 - 11)

73.  Upon conviction of the offenses set forth in Counts 1-11 of this Indictment, the defendants shall forfeit to the United States pursuant to 21 U.S.C. § 853(a): (a) any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the said violations; and (b) any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violations, including but not limited to the following property:

a.  Twenty-Four Thousand Four Hundred Eighty-Five Dollars ($24,485.00) in United States Currency, seized on November 19, 2010, by Agents of the IRS pursuant to a federal search warrant on a safe deposit box of Dr. Christopher Stegawski at Fifth Third Bank.

b.  Five Thousand Three Hundred Ninety Dollars ($5,390.00) in United States Currency, seized on November 18, 2010, by the IRS during a consensual search of the residence of John and Stephanie Callahan at 1214 Shepherd Fork Road, West Portsmouth, Ohio.

c.  Four Thousand Eight Hundred Sixty-Three Dollars ($4,863.00) in United States Currency seized on November 18, 2010, by the IRS pursuant to a federal search warrant at the South Point Clinic located at 211 Township Road 1013, Suites 2 and 3, South Point, Ohio.

19

d.    Six Thousand Three Hundred Ninety Dollars ($6,390.00) in
      United States Currency seized on November 18, 2010, by
      the IRS pursuant to a consensual search of a gold Honda
      Minivan parked in front of 211 Township Road 1013, South
      Point, Ohio.

## FORFEITURE ALLEGATION 2

### (COUNTS 6 - 11)

74.    Upon conviction of the offenses set forth in Counts 6-

11 of this Indictment, the defendants shall forfeit to the United

States pursuant to 18 U.S.C. § 982(a)(1): any property, real or

personal, involved in such offense, and any property traceable to

such property including, but not limited to a sum of money equal

to the total amount of money involved in each offense for which

the defendants are convicted. If more than one defendant is

convicted of an offense, the defendants so convicted are jointly

and severally liable for the amount involved in such offense.

### Substitute Assets

75.    If any of the above-described forfeitable property, as

a result of any act or omission of the defendant,

> i.    cannot be located upon the exercise of due
>       diligence;
>
> ii.   has been transferred or sold to, or deposited
>       with, a third person;
>
> iii.  has been placed beyond the jurisdiction of the
>       Court;
>
> iv.   has been substantially diminished in value; or
>
> v.    has been commingled with other property which
>       cannot be subdivided without difficulty:

20

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) as incorporated in Title 18,

United States Code 982 by 18 U.S.C. § 982(b)(1), to seek

forfeiture of any other property of said defendant up to the

value of the above forfeitable property.

         A True Bill.


         _____

         Grand Jury Foreperson


CARTER M. STEWART
United States Attorney


ROBERT C. BRICHLER
CHIEF, ORGANIZED CRIME DRUG ENFORCEMENT TASK FORCE